## A01A1445. COALSON v. THE STATE.
### (555 SE2d 128)

BLACKBURN, Chief Judge.

Byron Herbert Coalson III appeals the judgment of conviction and sentence entered following his jury trial. He contends that the trial court erred in denying his motion for new trial and in overruling his special demurrer to the indictment, and that the evidence did not support the verdict. On August 8, 2000, Coalson was convicted of one count of child molestation (Count 1), one count of enticing a child (Count 2), two counts of sexual exploitation of children (Counts 3 and 4), and one count of sexual exploitation (Count 5). On August 30, 2000, Coalson was sentenced to serve a total of 12 years in prison followed by 48 years on probation, with special conditions.

Coalson's indictment was based on the following: Count 1 was for child molestation, in that he fondled the genitals of J. S., a male child under the age of 16 years, in violation of OCGA § 16-6-4; Count 2 was for enticing said J. S. into accused's car for the purpose of child molestation, in violation of OCGA § 16-6-5; Count 3 was for the sexual exploitation of children, in that he knowingly reproduced photographs located on the Internet depicting minors under the age of 16 engaged in sexually explicit conduct, to wit: sexual intercourse, masturbation, and the lewd exhibition of genitals, in violation of OCGA § 16-12-100 (b) (5); Count 4 was for sexual exploitation of children, in that he knowingly reproduced a video located on the Internet depicting a minor under the age of 16 engaged in sexually explicit conduct, to wit: sexual intercourse and masturbation, in violation of OCGA § 16-12-100 (b) (5); and Count 5 was for sexual exploitation, in that he did intentionally utilize an Internet service to entice J. S., a child under 16 years of age, for the purpose of committing the offense of child molestation, in violation of OCGA § 16-12-100.2.

On appeal, Coalson contends that the evidence did not support the verdict, and that the trial court erred in denying his motion for funds to hire an expert witness and in overruling his special demurrer regarding the sexual exploitation of children charges contained in Counts 3 and 4 of the indictment, neither of which specified the name of the victim.

Although the outcome of the underlying trial depended largely on the credibility of the 11-year-old victim, the credibility of wit-

nesses and the resolution of such conflicts are for the jury. On appeal of a conviction based on a jury verdict, this court resolves all conflicts in favor of the verdict and examines the evidence in a light most favorable to support that verdict. See *Hall v. State.*[1] See also *Coleman v. State.*[2]

So viewing the evidence, the record reveals that during the first few weeks of January 2000, Coalson established an Internet and telephone relationship with J. S., an 11-year-old boy. When he contacted J. S. on the Internet, Coalson initially pretended to be a female who attended J. S.'s school. When J. S. caught him in this lie, Coalson then admitted that he was a gay man. J. S. continued to visit with Coalson on the Internet and to talk to him on the telephone, because he thought it was cool to have a friend that was 18 and who drove a Mustang automobile. Coalson began sending sexual messages to J. S. and sent him a photograph of two young boys engaged in oral sex. While talking to J. S., Coalson "jacked off" and engaged in sexual conversations. On the evening of January 26, 2000, Coalson appeared at the victim's house and pretended to be the older brother of J. S.'s girlfriend, and that he was there to take J. S. to a basketball game. While J. S. went along with the story, he did believe that Coalson was taking him to a basketball game.

Instead of taking J. S. to a basketball game, however, Coalson took the victim to McDonald's and then took him to see Chipper Jones's house. Coalson drove J. S. to a home in Bremen where the mailbox read "C. Jones." Afterward, as he was driving down the road, Coalson began rubbing the victim's leg, unzipped J. S.'s pants, and rubbed the victim's penis. J. S. told Coalson to stop, because it just did not feel right. Coalson told J. S. that he loved him and had previously tried to kiss him. J. S. testified that he had no idea that any of this was going to happen when he left with Coalson for the basketball game.

Coalson admitted during direct examination that he had e-mailed the victim, written that he loved him, and talked to the victim on the telephone. Coalson also admitted that he lied to the victim's parents about his name and a basketball game in order for the victim to be allowed to leave home with him, and that he took the victim to McDonald's and took him to the house with "C. Jones" on the mailbox. He also admitted that he was alone in the car with the victim in the dark the entire time they drove around that evening.

During cross-examination, Coalson admitted that he had e-mailed many young boys, including J. S., asking for their physical descrip-

---

[1] *Hall v. State*, 201 Ga. App. 626 (411 SE2d 777) (1991).
[2] *Coleman v. State*, 194 Ga. App. 404 (1) (391 SE2d 15) (1990).

tions and photographs, that he called the victim "baby," and told him that he loved him. Coalson also admitted that he liked to watch young boys on the Internet and masturbate while watching them, as he is sexually excited by young boys. He admitted that he had had Internet relationships with other young boys.

J. S. provided police with pornographic e-mail which he had received from Coalson. Also, during a search of Coalson's residence, the authorities found computer disks, pictures, and a videotape containing images of young boys, ages 11 through 15, engaging in sexually explicit conduct (State's Exhibits 2-13 and 15A-22). Also placed into evidence was a videotape which showed Coalson masturbating while watching young boys in sex acts on the computer (State's Exhibit 14).

1. We first address Coalson's contention that the evidence was insufficient to support the verdict under the standard of *Jackson v. Virginia.*[3] While Coalson enumerates this alleged error, he provides no argument, citation of authority or citations to the record to support his position. While Coalson has abandoned this enumeration of error under Court of Appeals Rule 27 (c) (2), we have nonetheless reviewed the record and find that the evidence in this case clearly supports the verdict and satisfies the standard set forth in *Jackson v. Virginia,* supra. This enumeration of error is without merit.

2. We next address Coalson's contention that the trial court erred in overruling his special demurrer as to Counts 3 and 4 of the indictment. Coalson argues that the indictment was fatally flawed as to Counts 3 and 4, because each was a charge of sexual exploitation of children, and neither specified the name of the victim. Coalson relies upon *Dennard v. State,*[4] a sexual exploitation of children case where this court reversed the trial court's overruling of defendant's special demurrer on interlocutory appeal, because the indictment did not specify the name of the victim. See *Broski v. State;*[5] *Irwin v. State;*[6] *State v. Kenney.*[7] Coalson also relies upon our Supreme Court's holding in *Aman v. State*[8] that OCGA § 16-12-100 must be strictly and narrowly construed. Of course, under Georgia law, all criminal statutes must be strictly construed.

*Dennard,* supra, involved the overruling of both general and special demurrers. A general demurrer challenges the sufficiency of the substance of an indictment, while a special demurrer attacks the

[3] *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).
[4] *Dennard v. State,* 243 Ga. App. 868 (534 SE2d 182) (2000).
[5] *Broski v. State,* 196 Ga. App. 116, 118 (1) (395 SE2d 317) (1990).
[6] *Irwin v. State,* 117 Ga. 722 (2) (45 SE 59) (1903).
[7] *State v. Kenney,* 233 Ga. App. 298, 299 (1) (a) (503 SE2d 585) (1998).
[8] *Aman v. State,* 261 Ga. 669 (409 SE2d 645) (1991).

form of an indictment. The subject case involves only the overruling of a special demurrer. The true test of the sufficiency of an indictment to withstand a special demurrer

> is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction. It is useful to remember that the purpose of the indictment is to allow defendant to prepare his defense intelligently and to protect him from double jeopardy.

(Citations, punctuation and emphasis omitted.) *Snider v. State.*[9] See also *Dennard,* supra.

The subject case is distinguishable from *Dennard* on several grounds. In *Dennard,* the defendant was charged with attempted sexual exploitation of children for soliciting a particular person over the Internet to engage in sexually explicit conduct and be videotaped. There was, in fact, no child involved, as the defendant was communicating with an undercover police officer via the Internet. For that reason, there was no victim's name listed in the indictment. Our Supreme Court has held that in an indictment for an offense against the person of another, the person injured should be referred to by his correct name, if it is known, or by some name by which the victim is known. *Irwin,* supra. If, however, the gist of the crime is an offense against the public rather than a particular person, it is not necessary to name the victim of such charges in the indictment. Thus, in a prosecution for soliciting a prostitute, we have held that it is not necessary to name the person solicited, as the gist of the offense is the harm done society by such act. *Day v. State.*[10] See also *Kenney,* supra. In *Dennard,* this court reversed the trial court's overruling of Dennard's special demurrer as to the failure to name the victim in the indictment and concluded that "each of the crimes with which Dennard is charged is a crime against a particular person." *Dennard,* supra at 877 (2).

We note that the type of Internet sting which occurred in *Dennard* could now be prosecuted under OCGA § 16-12-100.2, computer pornography and child exploitation, which was effective July 1, 1999. This statute was not applied in *Dennard* as the criminal acts in that

---

[9] *Snider v. State,* 238 Ga. App. 55, 58 (2) (516 SE2d 569) (1999).
[10] *Day v. State,* 70 Ga. App. 819, 820 (29 SE2d 659) (1944).

case occurred prior to July 1, 1999. See *Dennard*, supra at 875-876.

Dennard was charged under OCGA § 16-12-100 (b) (1), which reads as follows: "It is unlawful for any person knowingly to employ, use, persuade, induce, entice, or coerce any minor to engage in or assist any other person to engage in any sexually explicit conduct for the purpose of producing any visual medium depicting such conduct."

Clearly, this statute contemplates offensive conduct directed toward a particular individual, rather than the public in general, and the victim's name was required to be included in the indictment under the facts of *Dennard*.

On Counts 3 and 4 in the subject case, however, Coalson was charged under OCGA § 16-12-100 (b) (5), which reads as follows: "It is unlawful for any person knowingly to create, reproduce, publish, promote, sell, distribute, give, exhibit, or possess with intent to sell or distribute any visual medium which depicts a minor engaged in any sexually explicit conduct."

Clearly OCGA § 16-12-100 (b) (5) was intended to address the problem of child pornography, its creation, reproduction, and distribution, rather than the victimization of the children who appear in such material. The offense against the children who appear in pornographic material is separately punishable under OCGA § 16-12-100 (b) (1) and other statutes. It is thus the offense to the public at large which is addressed by OCGA § 16-12-100 (b) (5), and it is not necessary to name the children who appear in the pornographic material in a prosecution under this statute. While those who create the child pornography might well know who the victims depicted in such material are, it is highly unlikely that those who reproduce or distribute the material would know the names of those children. For the purposes of indictment under OCGA § 16-12-100 (b) (5), the victim contemplated therein is the public at large. *Dennard*, supra, is thus distinguishable from the subject case.

We note also that Coalson is provided no support by the very language of *Dennard*. *Dennard* involved the grant of an interlocutory application and, unlike the present case, had not been tried at the time this court acted on the appeal. This court stated the following in *Dennard*:

> If the trial has already occurred before we review the merits of a special demurrer, we will not reverse a conviction in the absence of prejudice to the defendant, since that would amount to a mere windfall to defendant and contribute nothing to the administration of justice. Had this case proceeded to trial and verdict under the current indictments, we do not believe that reversal would be necessary due to the failure to name the intended victim, since it is apparent

> that Dennard understands the nature of the charges against him based on information gleaned from sources other than the indictment itself. However, because we are reviewing the indictment on interlocutory appeal, before any trial, we must apply the rule that a defendant who has timely filed a special demurrer is entitled to an indictment perfect in form and in substance. An indictment alleging a crime against another is not perfect in form if it contains no information as to the alleged victim.

(Punctuation and footnotes omitted.) Id. at 877 (2).

This court, reviewing *Dennard* on interlocutory appeal and having determined that it involved the allegation of an offense against a particular person, rather than against the public in general, reversed the trial court on the issue of the special demurrer. The present case, of course, involves a direct appeal following a jury trial, and *Dennard* provides no authority for Coalson.

We also note that the subject special demurrers were not filed until well after arraignment and were thus not timely. This fact was discussed at a hearing, but the trial court never ruled on the issue or authorized the late filing of said demurrers. While the trial court did overrule the demurrers at the same time it denied the motion for funds, the order does not indicate a basis therefor or indicate the grant of permission for the late filing.

For the above reasons, we cannot say that the trial court erred as a matter of law in overruling Coalson's special demurrers to Counts 3 and 4, and defendant's contentions are without merit.

3. Coalson contends that the trial court erred by denying his motion for funds to hire an expert witness to review the evidence and ascertain whether the investigation was proper and whether the victim acted like a typical molested child. This court applies an "abuse of discretion" standard in reviewing the trial court's ruling on a motion for funds to obtain an expert witness. The trial court's ruling will not be disturbed by this court absent an abuse of discretion. *Davis v. State.*[11]

A motion for funds to obtain an expert witness requires a reasonable showing to the court, by the defendant, why the expert's services are required, what services are to be performed by such expert, the identity of the expert, and the cost to provide the needed services. The defendant must also demonstrate that without the assistance of the expert, the defendant's trial would be rendered fundamentally unfair. The trial court has discretion to grant or deny a motion for

---

[11] *Davis v. State*, 244 Ga. App. 345, 348-349 (6) (535 SE2d 528) (2000).

funds for an expert witness. *Tatum v. State*;[12] *Thomason v. State*;[13] *Roseboro v. State*;[14] *Brown v. State*.[15] Coalson filed a brief at the court's request, in which he simply stated the name of the proposed expert, his hourly rate of $100, and the maximum fee of $1,200. He further stated in his brief filed with the trial court only that

> [t]he services of this expert [are] needed to determine whether proper interviewing techniques were performed in the above referenced case, as the State intends to use the child hearsay statute to convict the defendant. Moreover, the expert will address the issue of whether the alleged victim's behavior is consistent with someone who was molested.

Coalson's motion and brief to the trial court are devoid of any explanation of what evidence was to be reviewed by the expert, why such evidence was required by the defendant, how the expert planned to review the evidence, and how his trial would be rendered fundamentally unfair without the expert's testimony. While Coalson argues that J. S. could have been influenced by improper questions, he does not support his conjecture with any facts. There were no recordings made of any of the interviews conducted of J. S., and so there was nothing for the expert to review. Coalson does not point to a single question or item of testimony at the trial to support his conjecture. Coalson made no proffer to demonstrate what the proposed expert would have been able to show had he been authorized by the court.

We note that the State did not utilize an expert in the trial of this case, so there was no expert opinion to be refuted. The tenor of Coalson's argument seems to be that J. S. was a consenting party to the interaction between himself and Coalson. For example, in his brief Coalson states:

> The child's statements in the incident reports show or imply that he was a helpless victim. The evidence, however, shows that this alleged victim voluntarily placed the appellant's name and email address on his "buddy list"; repeatedly initiated telephone calls to the appellant; and was the only person who knew about any basketball game at his school.

While, without question, there are many indications that J. S. might well have been a willing participant in much of his interaction with

---

[12] *Tatum v. State*, 259 Ga. 284, 286 (2) (380 SE2d 253) (1989).
[13] *Thomason v. State*, 268 Ga. 298, 310 (7) (486 SE2d 861) (1997).
[14] *Roseboro v. State*, 258 Ga. 39, 41 (3) (d) (365 SE2d 115) (1988).
[15] *Brown v. State*, 242 Ga. App. 106, 108 (2) (528 SE2d 868) (2000).

Coalson, this fact in no way excuses Coalson's criminal conduct. Like statutory rape, consent is not a defense to child molestation. If indeed J. S. is a troubled youth who willingly engages in criminal sexual acts, one might well ask whether such condition results from prior acts of molestation initiated by pedophiles like Coalson.

Coalson argues that he was entitled to introduce evidence as to whether the victim's behavior was typical of that displayed by a child who had been molested, citing *Hall*, supra. In *Hall*, the trial court refused to allow defendant's expert witnesses to testify that the victim in that case had not exhibited the unusual and inappropriate behavior typical of a sexually abused child. On appeal, this court held in *Hall* that

> [a]ppellant was simply attempting to elicit testimony as to whether the victim had exhibited that *behavior* which, in the opinions of the witnesses, was typically displayed by a sexually abused child, not an *opinion*, based upon the victim's behavior, as to whether she had actually been molested. The "typical" behavior of sexually abused children is not within the ken of the average juror and is, therefore, a proper matter for expert testimony. . . . In the instant case, however, the State raised no objection to the expertise of appellant's witnesses and the trial court erred in sustaining the State's objection to the relevancy of their proffered testimony.

(Emphasis in original.) *Hall*, supra at 627 (2).

While the issue in *Hall* was correctly decided, it is not the issue before us in the present case. The issue in *Hall* was: did the trial court err in excluding expert testimony as to the typical behavior of molested children, based upon the relevancy of that information? Here, the issue is: did the trial court abuse its discretion in not providing funding for an expert for this indigent defendant?

Coalson does not address a part of the holding in *Hall*, which would preclude this court from applying *Hall* in this case as Coalson had made no proffer as to the expert's testimony. In *Hall*, this court held inter alia: "The trial court sustained the State's objections to certain questions propounded by appellant to several defense witnesses and these evidentiary rulings are enumerated as error. Our consideration is necessarily limited to those instances wherein appellant made a proffer of the answers that he expected to elicit." *Hall*, supra at 626 (2). See also *Lee v. State*.[16]

Coalson also argues that he was precluded by the court's ruling

---

[16] *Lee v. State*, 237 Ga. 179, 180 (3) (227 SE2d 62) (1976).

on the expert issue from introducing J. S.'s school records which he had subpoenaed. He states in his brief filed in this court that, "[u]nfortunately, without an expert witness, such [school] records were not admissible." A review of the record indicates that the trial court authorized the admission of the school records for the purpose of determining the impact J. S.'s experiences with Coalson might have had on his school grades. Coalson elected not to tender such records.

We cannot say as a matter of law that, under the facts of this case, the trial court abused its authority in denying Coalson's motion for funds for an expert. The ruling of the trial court on this issue is affirmed.

*Judgment affirmed. Pope, P. J., and Mikell, J., concur.*

DECIDED OCTOBER 5, 2001.

*Meng H. Lim,* for appellant.
*James R. Osborne, District Attorney, Laura L. Herrin, Assistant District Attorney,* for appellee.