NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 9, 2025

S25A1395. MONTGOMERY v. THE STATE.

PINSON, Justice.

Christie Montgomery was convicted of malice murder and other crimes in connection with the death of Justice Jackson.[1] On appeal, she contends that the evidence was not sufficient under OCGA § 24-14-6 to support her conviction and that the trial court erred by not granting a mistrial based on juror misconduct. These

---

[1] The crimes occurred on May 17, 2018. On August 16, 2018, a DeKalb County grand jury returned an indictment against Montgomery on four counts: malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony. On January 15, 2019, Montgomery was reindicted by a grand jury on those same counts. She was tried by a jury in March 2022. The jury returned a guilty verdict on all counts. The trial court sentenced Montgomery to a total sentence of life plus five years in prison. She received a life sentence for malice murder and five years to be served consecutively to the life sentence for possession of a firearm during the commission of a felony. The court found that the felony murder count was vacated as a matter of law, and the aggravated assault count merged with malice murder. Montgomery filed a motion for new trial, followed by an amended motion, which the trial court denied. She then timely appealed to the Court of Appeals which transferred the case to this Court. This case was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

claims fail. The State presented direct evidence of Montgomery's guilt, so OCGA § 24-14-6 does not apply here. And under Supreme Court Rule 22, Montgomery has abandoned her claim that the trial court erred in denying her motion for mistrial.

1. The evidence presented at trial showed the following. In 2018, Montgomery and her son were living in an apartment in DeKalb County with Chelsea Hughes and Jackson. Hughes had been introduced to Montgomery by one of Jackson's friends, Josh O'Cain, who knew that Hughes, her infant son, and Jackson were living in Hughes's car. After meeting Hughes, Montgomery agreed to let her stay in the bedroom of her apartment for a couple of weeks in exchange for "fifty to hundred dollars a week, whatever [Hughes] could afford."[2] Jackson often stayed at the apartment with Hughes too.

On the night of the shooting, Montgomery received a call from

___

[2] Hughes's infant son had been living in the apartment as well. However, the child was not present at the home during the shooting because about a week before the incident Hughes sent him to live with her brother in Mississippi.

an "acquaintance," Walter Pless, who asked her to pick him up because it was an "emergency." Montgomery and her son left the apartment around 11 p.m. to go pick him up. When they left, no one else was home.

That same night, Hughes was working the evening shift at a restaurant. When her shift ended sometime between 11 p.m. and midnight, Jackson picked her up and they drove to Montgomery's apartment. A couple of hours later, Jackson went to sleep and Hughes stayed up to eat something. While Hughes was eating, O'Cain arrived at the apartment. Hughes let O'Cain inside, and she went to bed shortly after.

Sometime after Hughes had fallen asleep, Montgomery returned home with a group of people, including Pless. Hughes was awakened by the sound of someone banging on the bedroom door. Jackson opened the door to find Montgomery yelling that someone

stole her marijuana.[3] Jackson and Hughes walked out of the bedroom and went into the living room where they saw "four or five other people" with Montgomery. The group "bicker[ed]" about who stole the marijuana until Montgomery said, "Well, I guess everybody has to go because I don't want a thief in my house." At that point, Montgomery also kicked Hughes and Jackson out of the room she was letting them stay in. Hughes testified that as she was leaving the apartment with her belongings, she saw Montgomery with a gun in her hand.

After Jackson and Hughes had carried their belongings to Hughes's car, Hughes noticed that she was missing her cell phone. She walked back up to Montgomery's unit and Montgomery allowed her back inside to look for it. Hughes testified that she again saw that Montgomery had a gun in her hand. While Hughes was looking for her phone, the other people inside were still "bickering." In response, Montgomery said, "eff this," and she stepped outside.

---

[3] At trial, Montgomery testified that someone had stolen 30 dollars from a cabinet in the kitchen. She did not mention marijuana.

Shortly after that, Hughes heard a gunshot followed by more gun-shots. At trial, Hughes testified that she did not see the shooter,[4] but O'Cain testified that while he was standing outside with Jackson, he saw Montgomery come outside, hold up a gun, and then shoot Jackson.

After the shooting ended, Montgomery went into the apartment and pushed Hughes outside. Hughes then checked on Jackson, who said that he had "been hit." Hughes tried to get Jackson to her car, but he collapsed before reaching it. Hughes screamed for O'Cain and began knocking on "a lot of doors" to get help before the police and an ambulance finally arrived.

At the scene, police recovered a black Taurus nine-millimeter pistol near where Jackson was lying. Hughes said the gun belonged to her. They also found six cartridge casings that matched Hughes's

---

[4] Hughes also testified that a man wearing a hoodie was standing outside in front of Jackson and O'Cain. She admitted that, at one point that night, she saw the man in the hoodie take Montgomery's gun because Montgomery was "waving" it around "and it made him uncomfortable." Although Hughes did not see the shooting, she identified this man as the shooter in her first statement to the police.

gun and some ammunition in her car. When police searched Montgomery's car, they recovered a nine-millimeter JAG Luger +P cartridge casing, but no firearm. At trial, Montgomery testified that she owned a Ruger nine-millimeter handgun that she carried with her in the car and stored under her mattress in the living room of her apartment. She said she put it back under her mattress after she returned home from picking up Pless on the night of the shooting.

At trial, the State presented testimony from a GBI firearms expert, Noah Burdick. Burdick testified about the difference between revolvers and semi-automatic pistols. He also testified that, according to his examination, neither the bullet that killed Jackson nor the cartridge casing found in Montgomery's car matched Hughes's firearm. Instead, the markings on the bullet were consistent with it having been fired by an array of possible firearms, including a Ruger.

2. Montgomery claims that the evidence was not sufficient under OCGA § 24-14-6 to support her conviction.[5] Under that statute, to support a conviction based on circumstantial evidence, the evidence viewed in the light most favorable to the verdict must "exclude every other reasonable hypothesis" except that the defendant was guilty of the charged offense. OCGA § 24-14-6; see *Brown v. State*, 288 Ga. 902, 904 (2011) ("When deciding whether the evidence was sufficient to satisfy [the predecessor to OCGA § 24-14-6], we again view the evidence in the light most favorable to the verdict."). But this statute does not apply if the State presents any direct evidence of guilt. *Jackson v. State*, 311 Ga. 626, 630 (2021). And here, although much of the evidence against Montgomery was circumstantial, the State presented direct evidence in the form of eyewitness testimony from O'Cain, who stated that he saw Montgomery raise a gun and then shoot Jackson. See *Douglas v. State*, 321 Ga. 739, 747 (2025). Because the State presented direct evidence of Montgomery's

---

[5] Montgomery does not raise any sufficiency claim grounded in due process under *Jackson v. Virginia*, 443 US 307 (1979).

guilt, OCGA § 24-14-6 does not apply, and so Montgomery's claim fails.

3. Montogomery claims that the trial court erred by not granting a mistrial based on juror misconduct. At trial, Montgomery moved for a mistrial after a juror acknowledged that he had conducted "research" on guns and bullet calibers. After the rest of the jurors testified that their deliberations were not affected by that juror's conduct, the trial court denied Montgomery's mistrial motion and instead dismissed the juror, sat an alternate juror, and instructed the jury to restart deliberations. Montgomery now claims that the trial court erred by not granting a mistrial, but she neither makes any argument nor cites any authority in support of that claim on appeal. The claim is therefore deemed abandoned. See S. Ct. R. 22(1); *French v. State*, 321 Ga. 665, 670 (2025).

*Judgment affirmed. All the Justices concur.*